422 F.2d 77
 73 L.R.R.M. (BNA) 2244
 ITT WORLD COMMUNICATIONS, INC., a Delaware corporation,
Plaintiff-Appellant,
v.
COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO, and Local No.
1174, Communications Workers of America AFL-CIO,
and Local No. 1172, Communications
Workers of America, AFL-CIO,
Defendants-Appellees.
 No. 189, Docket 33674.
 United States Court of Appeals Second Circuit.
 Argued Oct. 29, 1969.
Decided Jan. 19, 1970.
 
 Alfred Giardino, New York City (Lorenz, Finn & Giardino, Charles M. Mattingly, Jr., New York City, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., on the brief), for plaintiff-appellant.
 H. Howard Ostrin, New York City (Cooper, Ostrin, DeVarco & Ackerman, Ronald J. Brooks, Philip D. Tobin, David Kreitzman, New York City, Kane & Koons, Charles V. Koons, Washington, D.C., on the brief), for defendants-appellees.
 Before LUMBARD, Chief Judge, and MEDINA and FEINBERG, Circuit Judges.
 FEINBERG, Circuit Judge:
 This case poses the familiar problem of construing the arbitration provisions of a labor agreement. Simply stated, the issue is whether the parties agreed to arbitrate claims of contract violation brought by an employer as well as those brought by a union. The employer is ITT World Communications Inc.; the unions are Communications Workers of America, AFL-CIO and two of its locals, hereafter referred to as the 'Union.' ITT appeals from an order of the United States District Court for the Southern District of New York, Milton Pollack, J., which stayed ITT's damage action against the Union pending arbitration. For reasons indicated below, we affirm the order.
 
 
 1
 The facts giving rise to the dispute are relatively simple. ITT alleges that the Union violated the 'no strike' provision of the collective bargaining agreement in November 1968. Shortly thereafter, ITT brought suit in the district court under section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. 185. The complaint alleged breach of contract and sought $250,000 in damages. The Union filed its answer denying the allegations. In March 1969, ITT moved for summary judgment; the Union thereupon moved under 9 U.S.C. 3 for a stay of the action pending arbitration of the dispute. The motions came on before Judge Pollack, who held that the arbitration provisions of the agreement covered the dispute and that the Union, by filing an answer in the law suit, did not waive its right to compel arbitration.[1]
 
 
 2
 Article VI of the contract, which is titled 'Arbitration,' provides in pertinent part as follows:
 
 
 3
 Section 1.
 
 
 4
 Any matters disputed or in disagreement, or the subject of any controversy between the parties relating to and involving the interpretation, construction, or application of the terms of this Agreement, which the parties cannot adjust satisfactorily under the Grievance Procedure, may be submitted to arbitration for final and binding determination. Section 2.
 
 
 5
 (a) Notification of intent to proceed to arbitration must be made within thirty (30) calendar days after mailing to the Union, by registered mail, the Company's answer in Step 3 of the Grievance Procedure, otherwise the grievance shall be deemed to be settled. Section 3, Article V, to the contrary notwithstanding only the Union shall have the right to invoke arbitration of grievances processed in Article V.
 
 
 6
 (b) Within two (2) weeks (unless mutually extended) of notification, by either party to the other, of intent to proceed to arbitration, either party may request arbitration. Such arbitration shall be submitted to the Federal Mediation and Conciliation Service (FMCS) * * *.
 
 
 7
 The provisions of Section 1 are couched in very broad terms which seem at first blush to make arbitrable ITT's claim that the Union violated the contract. There is unquestionably a basic dispute over whether the Union violated Article VII of the agreement, which contains the 'no-strike' provision;[2] moreover, that dispute certainly involves the 'interpretation, construction, or application' of Article VII. However, Section 1 of Article VI does also contain the phrase 'which the parties cannot adjust satisfactorily under the Grievance Procedure.' ITT claims that this language is crucial because it 'interlinks' Article VI of the contract with Article V, which is set forth in the margin.[3] Since Article V concededly only covers employee grievances, ITT argues that the provisions for arbitration in Article VI must also be so construed. The Union retorts that the phrase relied on by ITT is not a limiting one, but merely describes when a claim is ready for arbitration. The Union points out that since an employer's claim of contract violation obviously cannot be adjusted under the Article V procedure, such a claim fits the Article VI description of 'matters disputed' which are ripe for arbitration. The Union finds further support for its position in Section 2(b) of Article VI, which explicitly recognizes that 'notification * * * of intent to proceed to arbitration' may be sent 'by either party to the other' and thereafter 'either party may request arbitration.'
 
 
 8
 These contending positions have brought forth further rebuttals and rejoinders in the briefs. For example, under its theory that arbitration applies only to employee grievances, ITT views its right to 'request arbitration' as merely a protection against having an employee grievance hang unsettled over its head indefinitely like a 'Sword of Damocles.' The Union characterizes that danger as 'fanciful.' The Union emphasizes that Articles V and VI are separate, with distinct procedures and differing coverage; the latter includes employer claims, while the former does not.
 
 
 9
 Both parties also rely on past practice. Thus, ITT says that it has never sought to arbitrate an employer claim, that when it brought a similar damage action in 1965, the Union did not seek arbitration, and that a Union official warned members during the 1968 strike that the walkout 'gives the company an opportunity to go into Federal Court.' The Union rebuts with very recent actions of ITT which it says show ITT recognition of the arbitrability of employer claims.
 
 
 10
 Finally, both sides call our attention to analogous judicial decisions. ITT relies most heavily on G. T. Schjeldahl Co., Packaging Machinery Division v. Local 1680, IAM, 393 F.2d 502 (1st Cir. 1968), and Boeing Co. v. International Union, UAW, 370 F.2d 969 (3d Cir. 1967). The Union invokes the imposing language of the Steelworkers' Trilogy[4] and cites numerous cases for the proposition that whether a union has violated a no-strike clause is an arbitrable dispute under the contract, e.g., Drake Bakeries Inc. v. Local 50, American Bakery Workers, 370 U.S. 254, 258, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962); Signal-Stat Corp. v. Local 475, United Electrical Workers, 235 F.2d 298, 301 (2d Cir. 1956), cert. denied, 354 U.S. 911, 77 S.Ct. 1293, 1 L.Ed.2d 1428 (1957); and Local No. 463, United Papermakers and Paperworkers, AFL-CIO v. Federal Paper Board Co., 239 F.Supp. 45 (D.Conn.1965).
 
 
 11
 From these volleys back and forth it appears to us that the Union has somewhat the better of it. Judge Pollack noted that Section 2(a) of Article VI fixes one time limit (30 days) for the Union to exercise 'its exclusive right to invoke arbitration of employee grievances' and Section 2(b), which does not mention employee grievances, fixes another period (two weeks) in which 'either party' may act. We agree with the judge that this is significant and that if 'the arbitration agreement was intended only to deal with employee oriented disputes, there would seem to be no need for time limits imposed on the employer within which to invoke arbitration.' In other words, we are not persuaded by the 'Sword of Damocles' argument although the court in Schjeldahl, supra, apparently was, to a modest extent.
 
 
 12
 As to the past practice relied on by ITT, the record indicates only one employer claim prior to the 1968 controversy and, even as to that, the law suit was withdrawn in less than a month. Considering the realities of collective bargaining, that period of time was too short to label the Union's failure to invoke arbitration a conclusive recognition that it could not; the one instance cited is too meager to be considered as authoritative past practice.[5] The Union's past practice claim is that after settlement of the 1968 strike, ITT itself invoked Article VI arbitration to confirm its right to discharge two employees. ITT says this was an 'employee-oriented' grievance and that its action was meant to bring matters to a head-- the 'Sword of Damocles' theory again. We also regard this incident as not determinative. In short, we view the past practice in this case as inconclusive, assuming it is entitled to any weight at all.
 
 
 13
 However, there is a much more important reason for affirming the judgment below. The unequivocal command of the Supreme Court in United Steelworkers of America v. Warrior & Gulf Navigation Co., supra, 363 U.S. at 582-583, 80 S.Ct. at 1353 (1960), was that:
 
 
 14
 An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.
 
 
 15
 We certainly cannot say 'with positive assurance' that Article VI 'is not susceptible of an interpretation that covers' employer, as well as employee, claims of contract violation. In addition to what we have already noted, we point out that the parties elsewhere in the contract showed that they knew how to clearly exclude a subject from arbitration when they so desired.[6] Had the parties wanted to do the same with claims of violation of the 'no-strike' clause, they could easily have been equally specific. The importance of clear exclusionary language to negate a presumption of arbitrability of a dispute about a no-strike clause was emphasized by the Supreme Court in Drake Bakeries, supra, 370 U.S. at 258-259, 82 S.Ct. at 1349 (1962):
 
 
 16
 The company earnestly contends that the parties cannot have intended to arbitrate so fundamental a matter as a union strike in breach of contract, and that only an express inclusion of a damage claim by the employer would suffice to require arbitration. But it appears more reasonable to us to expect such a matter, if it is indeed so fundamental and so basic to the company under the contract, to have been excluded from the comprehensive language of Article V if the parties so intended.
 
 
 17
 The combination of a broad arbitration clause and vague or no exclusionary language has usually, since the Trilogy, led to arbitration. See International Union of Electrical, Radio and Machine Workers v. General Electric Co., 407 F.2d 253, 257 (2d Cir. 1968), cert. denied, 395 U.S. 904, 89 S.Ct. 1742, 23 L.Ed.2d 217 (1969). In short, ITT's arguments at most raise a doubt whether the arbitration clause covers the dispute, but we are instructed to resolve that doubt 'in favor of coverage.' Doing so, we are required to affirm. However, it should be clearly understood that this disposition by no means condones Union misconduct, if that is what occurred, in this sensitive industry. As the Supreme Court said in Drake Bakeries, supra, 370 U.S. at 266, 82 S.Ct. at 1353:
 
 
 18
 If the union did strike in violation of the contract, the company is entitled to its damages; by staying this action, pending arbitration, we have no intention of depriving it of those damages. We simply remit the company to the forum it agreed to use for processing its strike damage claims.
 
 
 19
 The Union has suggested that Schjeldahl, supra, and Boeing, supra, both relied on by ITT, are distinguishable on their facts. As to the latter decision, that may be true, since the arbitration clause there did not say that 'either party' could request arbitration,[7] but we do not rest upon that.[8] For our decision, we rely on the reasons already set forth above. See also Local 463, United Papermakers and Paperworkers, AFL-CIO v. Federal Paper Board Co., supra (company, rather than union, successfully sought arbitration of violation of nostrike clause); Fifth Avenue Coach Lines, Inc. v. Transport Workers, Local 100, 235 F.Supp. 842 (S.D.N.Y.1964).
 
 
 20
 ITT also contends that the Union waived its right to arbitrate by filing an answer in the ITT damage action and by a four-month delay in seeking arbitration. However, it is well settled in this circuit that neither would constitute a waiver of the right to arbitrate in the absence of prejudice to the opposing party. Carcich v. Rederi A/B Nordie, 389 F.2d 692 (2d Cir. 1968). ITT claims that the rule in Carich is inapplicable because the dispute there arose from a commercial contract, not a collective bargaining agreement, and that any delay in a tense labor situation is by its nature prejudicial. While the argument is ingenious, we believe that the Carcich rule applies to labor as well as commercial disputes. The district court judge correctly found that ITT made no showing of prejudice resulting from the delay.
 
 
 21
 Accordingly, the judgment of the district court is affirmed.[9]
 
 LUMBARD, Chief Judge (dissenting):
 
 22
 I dissent.
 
 
 23
 I am convinced that ITT's contentions about the interrelationship between the grievance procedure set forth in article V and the arbitration provisions of article VI are correct. Thus, I would reverse Judge Pollack's order staying ITT's damage action under section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. 185.
 
 
 24
 It seems to me that the result which my brothers reach ignores the plain meaning of section 1 of article VI, which states that 'Any matters disputed * * * which the parties cannot adjust satisfactorily under the Grievance Procedure, may be submitted to arbitration for final and binding determination.' I would not hold this phrase to be 'vague' exclusionary language; rather, it limits arbitrable matters to those disputes which have first passed through the grievance machinery of article V, which the majority describes as 'concededly only cover(ing) employee grievances.' Since a violation of the no-strike clause is outside the grievance procedure's scope, neither ITT nor the union could seek arbitration. For the reasons set forth in greater detail below, Chief Judge Aldrich's opinion for a unanimous court in G. T. Schjeldahl Co., Packaging Machinery Div'n v. Local Lodge 1968, Int. Assoc. of Machinists, 393 F.2d 502 (1st Cir. 1968), is directly in point and should, on the strength of its reasoning, control the outcome of this appeal.
 
 
 25
 As did the First Circuit, I recognize the strong policy favoring labor arbitration enunciated in the Steelworkers' Trilogy, relied on by the majority. However, the applicable Supreme Court decisions also impose upon us a duty to determine what it was that the parties agreed to arbitrate. As Mr. Justice White stated in Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241, 82 S.Ct. 1318, 1320, 8 L.Ed.2d 462 (1967):
 
 
 26
 'Under our decisions, whether or not the company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties. 'The Congress * * * has by 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409.'
 
 
 27
 I fear that this stricture has been violated in the present case. Looking at the complete procedure for dispute resolution provided in article V, and article VI, sections 1 and 2, and at the past practice of the parties to the agreement, I conclude that violation of the no-strike clause was not arbitrable.
 
 
 28
 I agree that ITT can invoke arbitration. I do not agree, however, that it can do so with regard to any matters or disputes arising under the contract. Judge Pollack and the majority believe that 'if the arbitration agreement was intended to deal only with employee-oriented disputes, there would be no need for time limits imposed on the employer within which to invoke arbitration.' From this, the majority apparently concludes that either party can invoke arbitration at any time regarding any matter. The way in which sections 2(a) and 2(b) are structured convinces me that ITT and the union can only take to arbitration those matters which have been through the grievance procedure.
 
 
 29
 Sections 2(a) and (b) of article 6 provide:
 
 
 30
 '(a) Notification of intent to proceed to arbitration must be made within thirty (30) calendar days after mailing to the Union, by Registered mail, the Company's answer in Step 3 of the Grievance Procedure, otherwise the grievance shall be deemed to be settled. Section 3, Article V, to the contrary notwithstanding only the Union shall have the right to invoke arbitration of grievances processed in Article V.
 
 
 31
 '(b) Within two (2) weeks (unless mutually extended) of notification, by either party to the other, of intent to proceed to arbitration, either party may request arbitration. Such arbitration shall be submitted to the Federal Mediation and Conciliation Service (FMCS). * * *'
 
 
 32
 Invoking arbitration under these provisions is, as ITT contends, a two-step procedure. Section 2(a) of Article VI requires the union to furnish the employer with a 'notification of intent to proceed to arbitration' within 30 days after ITT mails the union its answer in the final step of the article V grievance procedure. That notification, however, does not bring about arbitration. After the notification, section 2(b) of Article VI provides that 'Within two (2) weeks (unless mutually extended) of notification, by either party to the other, of intent to proceed to arbitration, either party may request arbitration.' Thus, the two-week period for request by either party for arbitration follows the 30-day period for notification. The union argues that section 2(b) permits (either party to give notification of intent to proceed to arbitration.' This is correct, but only to the extent that either party can request arbitration of disputes that have passed through the grievance machinery. For section 2(b), rather than conferring an independent right to arbitration, is entirely compatible with the contractual scheme for arbitration of disputes after grievance proceedings have concluded, as set forth in sections 1 and 2(a) of article 6. Nothing said in section 2(a) prevents ITT from giving notification of intent to proceed to arbitration after a grievance has moved through the three steps of the grievance procedure. The first sentence of section 2(a), although it does not say 'either party,' does not limit the giving of a notification of intent to the union. The second sentence, which refers to section 3 of article 5, only excludes employees from invoking arbitration of grievances.[1]
 
 
 33
 Moreover, I think that it is perfectly reasonable that the employer might want to reserve a right to give notice of intent to proceed with arbitration after a grievance has passed through the grievance machinery of article V. This right could be important in some instances. Under the grievance provisions, an employee can process a grievance without union representation, and ITT is obligated to give notice of such claims to the union. The union, however, may choose not to intervene, and such a decision might be directly contrary to the wishes of most of its membership. In such a situation, with an obvious split between the union leadership and the rank-and-file, ITT might well want to go to impartial arbitration in the interests of labor peace, even after it had filed its answer in the final step of the grievance procedure. Section 2(a) prohibits the employee from doing this,[2] but section 2(b) allows the employer to do it. Going back to section 2(a), the employer must also act within the 30-day limit set for notification; if he does not, the grievance is deemed settled. Assuming the employer notified the union of its intent to proceed to arbitration within the 30-day period, the two-week provision in section 2(b) is also available to the union-- just as it is to the employer-- to permit it to avoid the 'Sword of Damocles.' See Schjeldahl, supra, 393 F.2d at 504. Thus, the two-week limit does serve an independent function.
 
 
 34
 I believe that the 'past practice' adverted to by the majority supports my interpretation that only those matters which have first passed through the grievance machinery are arbitrable. Even if it be conceded that the contract before us is ambiguous on its face-- which I do not concede-- I feel that we must attach weight to the practical construction of the contract by those who are parties to it. The Supreme Court stated in United Steelworkers of America v. Warrior & Gulf Nav. Co., supra, at 582-583, 80 S.Ct. at 1353, that an
 
 
 35
 'order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'
 
 
 36
 It seems to me that this directive is not intended to permit the district courts or the courts of appeals to limit their examination of the meaning of arbitration clauses to such an extent that the past practice becomes irrelevant when the exact meaning of the agreement is thought to be unclear. See generally, Schulman, Reason, Contract, and Law in Labor Relations, 68 Harv.L.Rev. 999 (1955).
 
 
 37
 Thus, with respect to past practice, ITT points out that no employer claim has ever been arbitrated under this or preceding agreements. Moreover, ITT brought a similar lawsuit for damages in 1965, and the union did not respond by seeking a stay pending arbitration. The majority states that the 1965 lawsuit was withdrawn in less than a month, and that such a short time period available for response means that this past experience must be ignored. While I might agree if that was all there was before us, I cannot ignore the union's course of action in the present controversy. ITT filed its complaint on November 12, 1968, and the union's answer was filed on January 2, 1969. It is conceded that this answer contained no claim or defense that the issue was arbitrable. In fact, the union made no such claim until much later. When ITT moved for summary judgment on March 13, 1969, the union's response was a motion, filed March 17, 1969, seeking a stay pending arbitration. The union asserts that their right to arbitrate is clear under the contract. If it is clear, it seems to me that it should be promptly asserted whenever the company proceeds to federal court. While I agree with the majority that there was no waiver as a matter of law, it does appear highly relevant that this claim was not made until more than four months after ITT's complaint was filed. The claim of arbitrability has all the trappings of a pure afterthought based on a strained reading of the contract.
 
 
 38
 The statement by a union official to the effect that the illegal strike gave the company a right to go into federal court, referred to by the majority in footnote 5 as 'not too significant,' cannot be totally disregarded. Given the union's course of conduct in the present controversy, it tends to support my conclusion that the application for a stay was merely an afterthought.
 
 
 39
 Finally, as to the union's argument that ITT itself invoked article VI with regard to a dispute over the discharge of two employees whom it regarded as instigators of the illegal strike, I find this past practice claim totally untenable. The union's point is that ITT invoked article VI arbitration although no article V procedure had preceded it, thus undercutting its position that the two articles are tied together. I think not, for the memorandum of agreement between ITT and the union settling the 1968 strike in effect waives the grievance procedure which of course would otherwise have prevailed.[3] Moreover, the fact that the parties drew up a special settlement agreement in a situation where the nostrike clause was breached seems to me to undercut the union's view that disputes arising out of such a breach should be handled under the ordinary dispute-resolution provisions of the contract.
 
 
 40
 I would reverse the other of the district court and permit ITT to prosecute its suit in the district court.
 
 
 
 [1]
 The judge also held that this disposition rendered moot ITT's motion for summary judgment
 
 
 [2]
 This provides:
 The Company agrees that during the life of this Agreement there shall be no lockouts, and the Union agrees that during the life of this Agreement there shall be no strikes, sitdowns, slowdowns, walkouts or stoppage of work, or impeding the conducting of operations of the Company for any reason whatsoever.
 
 
 [3]
 Grievance Procedure
 Section 1.
 If an employee shall have a grievance it must be presented in Step 1 of the Grievance Procedure within two weeks of the occurrence of the grievance except that:
 (a) grievances concerning wages may be taken up within six months of the occurrence of such grievance, and
 (b) grievances concerning seniority may be taken up at any time.
 Section 2.
 The grievance shall be taken up in the following manner:
 Step 1. The employee, or the shop committeeman, or the employee and the shop committeeman may present the grievance to the employee's supervisor. The supervisor shall give his answer to the grievance within two working days after the grievance has been presented.
 Step 2. (a) Failing a satisfactory answer in Step 1, the grievance may be presented verbally to the superintendent, or the station manager, or the department head or the appropriate designee of any of the above Company representatives as the case may be. An answer in writing or verbally shall be given by the Company representative either at the meeting or within three working days following the meeting. Grievances not taken up in this Step 2(a) within one week of receipt of the answer in Step 1 shall be deemed to be settled.
 (b) Failing a satisfactory settlement in (a) above, the grievance may be presented again in Step 2 but in writing only. The Company shall give its answer, also in writing, within one week after the grievance has been presented in this Step 2(b). In the event the grievance is not taken up in Step 2(b) within one week following receipt of the Company's answer in Step 2(a), the grievance shall be deemed to be settled. Grievances in this Step 2(a) and (b) shall be presented at meetings between the appropriate Company representative and the Union Grievance Committee. Such meetings shall not take place more than once per week and shall be scheduled, in advance, for a time mutually satisfactory to the Company representative and the Union Grievance Committee.
 Step 3. Failing a satisfactory settlement in Step 2, the grievance may be presented, in writing only, to the Director of Industrial Relations or his designee. Grievances not taken up in this Step 3 within two weeks from the date of receipt by the Union of the Company's answer in Step 2 above shall be deemed to be settled. An answer shall be given in writing by the Company to the Union within two weeks from the date of the presentation of the grievance by the Union Grievance Committee in the manner herein provided. Grievances shall be presented in this Step 3 at meetings between the Company representative and the Union Grievance Committee. Such meetings shall be arranged for the mutual convenience of the Company and the Union as to time and place. Step 3 Meetings shall take place not later than four weeks from the date the Union appealed the grievance to the Step 3.
 Grievances presented in writing in Step 2 and Step 3 shall be on a form which has been agreed upon between the parties. The form is designed so that the Company's answer will be given on it for Step 2 and Step 3. The Union's statements of the grievance shall contain the essential facts of the grievance and shall specify any alleged violation of the Agreement. This statement shall also contain the Union's proposed remedy.
 Section 3.
 Notwithstanding the above, it is expressly understood that any employee has the right to process a grievance through the three steps of the Grievance Procedure herein, without Union representation. The Company agrees to notify the Union of the existence of any grievance filed by an individual employee under this section when such grievance reaches Step 2 and Step 3 in the Grievance Procedure, and also of the time the grievance is to be discussed with the employee.
 Section 4.
 In the event the Company fails to give its answer to grievances within the times specified in each step of the Grievance Procedure herein, the Union shall have the right to proceed to the next step in this Grievance Procedure after the expiration of such specified times. This shall also be applicable to grievances in Step 3 of the Grievance Procedure in the event the Union elects to proceed to Arbitration under Article VI.
 
 
 [4]
 United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)
 
 
 [5]
 The contemporaneous letter from a Union official to its members stating that the 1968 walkout 'gives the Company an opportunity to go into Federal Court' is not very significant. The issue before us is whether ITT has the right to stay there, a proposition with which the letter, whatever its weight, does not deal
 
 
 [6]
 E.g., in Article XI, Section 3, which deals with training programs, the contract provides:
 When a specific training program is needed by the Company, the matter will be discussed with the Union. The Company and the Union will endeavor to agree upon the following details concerning such training program:
 (a) The length of the training period required to qualify employees for permanent full-time assignment to the job;
 (b) The amount of full-time instruction and the amount of an-the-job training;
 (c) The trainee or apprentice wage scale.
 In the event no agreement can be reached in a reasonable time, the Company, nevertheless, shall have the right to institute the specific training program and the Union shall be entitled to process a grievance through the Grievance Procedure on any of the above details that may be in dispute. Nothing in this section shall be subject to arbitration except disputes under Section 3(c) herein.
 
 
 [7]
 It should also be noted that Boeing did not discuss or even cite Yale & Towne Mfg. Co. v. Local 1717, IAM, 299 F.2d 882 (3d Cir. 1962), an earlier decision in the same circuit which pointed the other way
 
 
 [8]
 As to Schjeldahl, the asserted and perhaps overly technical 'distinction' is that the grievance and arbitration provisions there were in the same article and there were no other specific exclusions from arbitration, as there are in this case
 
 
 [9]
 Although it is thus unnecessary to deal with ITT's appeal from denial of its motion for summary judgment, we note that we would have no jurisdiction over that appeal in any event. Alart Associates, Inc. v. Aptaker, 402 F.2d 779 (2d Cir. 1968)
 
 
 [1]
 Article 5, section 3 of the collective bargaining agreement provides:
 Notwithstanding the above, it is expressly understood that any employee has the right to process a grievance through the three steps of the Grievance Procedure herein, without Union representation. The Company agrees to notify the Union of the existence of any grievance filed by an individual employee under this section when such grievance reaches Step 2 and Step 3 in the Grievance Procedure, and also of the time the grievance is to be discussed with the employee.
 
 
 [2]
 See note 1, supra, and accompanying text
 
 
 [3]
 This memorandum agreement is set forth in full, but the paragraphs to which the text refers are paragraphs 2 and 3
 'SUFFOLK COUNTY DEPARTMENT OF LABOR
 
 
 [1]
 OLD INDIAN HEAD ROAD, COMMACK, N.Y. 11725 LOU V. TEMPERA
 COMMISSIONER
 543-6000 Nov. 11, 1969 (correct date is 1968)
 Memorandum of Agreement by and between ITT World Communication Co. and CWA, AFL-CIO
 It is mutually agreed as follows:
 
 
 [1]
 The picket lines at all of the Company's facilities shall be discontinued and employees shall return to work immediately. Simultaneously with the lifting of the picket line and the return to work of employees, the Company shall commence negotiations with the Union on a list of 14 complaints or issues raised by Local 1174
 
 
 [2]
 Within 14 days the Company may propose disciplinary action against employees for activity-- connected with the walkout
 
 
 [3]
 The above proposed discharge action shall be submitted to an arbitrator selected by both parties the Union and the Company. No discharge shall be instituted unless the Company's clarges are sustained by the Arbitrator. If charges are not sustained the proposed discharge shall be dropped
 
 
 [4]
 Regarding the 14 issues of complaints mentioned in I above it is agreed that any of such issues not resolved satisfactorily which are clearly arbitrable under the Labor Contract the Union shall have the right to proceed to arbitration in the manner provided in said Labor Contract. Any other of said issues about which the Union and the Company cannot agree as to their arbitrability under the Labor Contract the Union shall have the right to submit the question of arbitrability to an arbitrator. In the event the arbitrator finds that the disputes are arbitrable the Company agrees to arbitrate the merits of such disputes
 For ITT World Communications
 WILSON MCMAKIN MICHAEL F. GAMBELLO
 For Communications Workers of America
 AFL/CIO
 CHARLES MCDONALD
 For Local 1174 CWA AFL/CIO
 MICHAEL MARINO
 For Suffolk County Labor Dept. Witness'
 GEORGE MEYER