In the Matter of The Bohack
Corporation, Debtor.

The BOHACK CORPORATION, Plaintiff,

v.

TRUCK DRIVERS LOCAL UNION NO.
807, INTERNATIONAL BROTHER-
HOOD OF TEAMSTERS, et al., Defend-
ants.

Nos. 74 B 933, 75 C 905 and 75 C 1191.

United States District Court,
E. D. New York.

April 21, 1977.

Shaw & Levine, New York City, for debtor/plaintiff; Jesse I. Levine, William M. Rifkin, New York City, of counsel.

O'Connor, Quinlan & Mangan, Long Island City, N. Y., for defendant Truck Drivers Local No. 807; J. Warren Mangan, Long Island City, N. Y., of counsel.

MISHLER, Chief Judge.

This is a consolidated appeal from two orders of the bankruptcy court, Parente, J., entered on October 15 and 21, 1976.

The facts of this case are set forth in the Second Circuit's opinion in *Truck Drivers Local 807 v. Bohack*, 541 F.2d 312 (2d Cir. 1976). To provide a proper framework for our discussion, we will summarize briefly the salient events of the Bohack Corporation's ("Bohack") recent, troubled past. In March 1973, Bohack and Truck Drivers Local 807 ("the union") entered into a three-year collective bargaining agreement. At that time, Bohack employed more than 120 members of the union. On July 30, 1974, Bohack filed a petition for arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 *et seq.* An order issued that day allowed Bohack to continue business operations, which then included approximately 150 retail supermarkets, as a "debtor-in-possession." *See* 11 U.S.C. § 742. Four and one-half months later, on December 16, 1974, Bohack terminated produce, dairy and bakery operations at its Brooklyn warehouse in favor of a contract with an independent wholesaler, leaving 60 Bohack truckdrivers without work. The union filed a grievance alleging Bohack had violated a provision of the collective bargaining agreement that limited the employer's right to transfer to others work done by members of the local union. On May 16, 1975, the Grievance Committee ruled that Bohack had violated article 32 of the Master Agreement.

Nonetheless, that same month, Bohack changed grocery suppliers. The new suppliers had their own drivers and, consequently, more Bohack drivers lost their jobs. By July 18, 1975, the remaining workers were terminated and that same day Bohack moved to reject the collective bargaining agreement pursuant to § 313 of the Bankruptcy Act, 11 U.S.C. § 713. The union began an action in this court pursuant to § 301(a) of the Labor-Management Relations Act, 29 U.S.C. § 185(a), to compel Bohack to perform the collective bargaining agreement. The union also sought to confirm the grievance award, the subject of a state court proceeding that Bohack had removed to the federal court.

On November 19, 1975, this court dismissed the union's petition to confirm the arbitrator's award, and remanded to the bankruptcy judge "the issue of the advisability of granting the debtor leave to arbi-

trate." On appeal, the Second Circuit affirmed the remand, although it directed this court to vacate an order restraining the union from picketing Bohack. The bankruptcy judge was instructed to determine:

(1) whether to affirm the contract, or whether the debtor has so conformed to the contract as to make it binding, *see In re Public Ledger, Inc.,* 161 F.2d 762, 767 (3d Cir. 1947), cited with approval in *REA Express, Inc., supra,* 523 F.2d at 170; (2) whether to grant the debtor's petition to reject the agreement as onerous, adhering to our admonition in *Kevin Steel* to "move cautiously in allowing rejection of a collective bargaining agreement," 519 F.2d at 707; and (3) whether to order, arbitration under its terms in any event, and on what issues.

541 F.2d at 320–21 (footnote omitted).

Several months prior to the Second Circuit's decision, on May 28, 1976, Bankruptcy Judge Parente had entered an order rejecting the collective bargaining agreement, which had expired on March 31, 1976, as onerous and burdensome to the debtor. On October 15, 1976, acting pursuant to the Second Circuit's remand, Judge Parente directed the union to submit its grievances with the debtor-in-possession "to arbitration, in accordance with the procedure set forth in Section 26 of the Bankruptcy Act, to determine if [the debtor-in-possession] breached said collective bargaining agreement and to render a finding on damages, if necessary." On October 21, 1976, after hearing re-argument, Judge Parente signed a second arbitration order, directing the parties to submit the following issues to arbitration:

a) The extent of damages to be recovered by the discharged employees upon the rejection of the labor·contract between The Bohack Corporation and Truck Drivers Local Union No. 807—International Brotherhood of Teamsters.

b) The amount and extent of pension, health insurance, welfare, vacation benefits and the value of seniority of each employee effected [sic] by said rejection of the employment contract.

c) The amount of the mitigation of such damages by reason of the subsequent employment of each employee or the receipt of unemployment insurance paid to said employee.

d) The issue of whether or not the contract rejected by the employer should be specifically enforced by the reinstatement of each employee notwithstanding the fact that the contract has expired . . . . .

In addition, this order provided that

issues determined by the arbitrators be subject to the further order of this Court, as to the status, amount and the validity of such arbitrator's award and it is

FURTHER ORDERED that the arbitrator shall proceed in accordance with the procedures set forth in Section 26, 11 U.S.C. Section 49.

Both Bohack and the union filed notices of appeal from the orders. On November 19, 1976, Judge Parente stayed arbitration pending the decision of this court.

## REJECTION OF THE COLLECTIVE BARGAINING AGREEMENT

Local 807 argues that Bohack failed to establish that the labor contract was onerous and burdensome and, therefore, the bankruptcy court erred in granting the petition to reject the agreement. Moreover, aside from the question of burdensomeness, the union contends that the debtor-in-possession became a party to the agreement by expressly or implicitly adopting its terms.

In *Shopmen's Local 455 v. Kevin Steel Prod., Inc.,* 519 F.2d 698 (2d Cir. 1975), the Second Circuit touched on the considerations that must inform the decision to allow rejection of a collective bargaining agreement:

[A] showing that the employer is not improperly motivated merely by a desire to rid itself of the union and its adherents, . . . convincing proof of the company's financial condition, the source of its difficulties and the benefit to be gained by rejecting the contract, and a careful weighing of the equities against

rejection, including the loss of intangible employee rights.

*Id.* at 707. The desire of the debtor-in-possession to improve its financial status is not, by itself, a valid reason for allowing rejection. *Id. See Brotherhood of Railway, Airline and Steamship Clerks v. REA Express,* 523 F.2d 164 (2d Cir.), *cert. denied,* 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975). *See generally* Miller, *Bankruptcy Law Introduction, The Second Circuit Review, 1974–75 Term,* 42 Brooklyn L.Rev. 709 (1976); 42 Brooklyn L.Rev. 726 (1976).

■ In this case, the bankruptcy judge properly allowed rejection of the collective bargaining agreement. Indeed, the choice presented was a simple one. If the contract was not rejected, the debtor would not be able to reorganize. Either the debtor was relieved of the contract or the entire business would collapse.

According to the testimony of Joseph Binder, the president of Bohack prior to the filing of the Chapter XI petition and its current executive vice-president, as of January 1974, Bohack had approximately 140 stores in operation. These stores were supplied by warehouses located at a central terminal in Brooklyn, known as Bohack Square. There was a grocery warehouse, meat warehouse, dairy warehouse, produce warehouse and delicatessen commissary. Approximately 50% of the 37 acres of terminal property were used for the warehouse and distribution operation. Bohack annually paid one and one-half million dollars for the carrying charges, maintenance and taxes on that portion of the terminal.

After the filing of the Chapter XI petition, the Creditors Committee directed Bohack to reduce the number of its retail outlets. The closings began in earnest in November 1974. By November 1975, the company held 72 retail stores, essentially now a regional chain, down from a high of 200 stores in 1973, when it qualified as a general supermarket. The closings substantially reduced the volume of merchan-

dise handled by the warehouse, which created a "negative cash flow." [1] (Tr. Nov. 17, 1975, at 29–30). As the store closings increased, the Creditors Committee directed Bohack to rid itself of the terminal, or face complete liquidation.

In December 1974 and January 1975, the produce, dairy and grocery warehouses were closed. To meet its dairy and produce needs, Bohack negotiated a supply agreement with a wholesaler, Shopwell, Inc. The debtor requested that its drivers be allowed to pick up the merchandise from Shopwell, but the wholesaler flatly refused, indicating "they had enough problems without getting involved with another union" (Tr. Nov. 17, 1975, at 39). Essentially the same pattern was repeated as Bohack closed the remaining warehouse operations and turned to wholesalers to meet its supply needs. Eventually, all the warehouses were closed and Bohack completely vacated the terminal except for some maintenance equipment and vehicles.

The savings to Bohack from the terminal closing totaled approximately two million dollars, including $925,000 saved by eliminating the labor contract and approximately one million dollars then being lost annually by the warehouse operation (Tr. Nov. 17, 1975, at 68–74). There was testimony, accepted as the opinion of an expert by Judge Parente, that a Chapter XI re-organization was impossible if the debtor continued to operate the warehouse (Tr. Nov. 17, 1975, at 81–82). Indeed, the union did not take issue with Bohack's position that the warehouse had to close (Tr. Nov. 17, 1975, at 70–71). The problem, of course, was that the new suppliers refused to use the Bohack drivers. The debtor, who was in an extremely precarious financial position—aside from other Chapter XI losses, it was unable to purchase the $2,500,000 worth of merchandise necessary to sustain its then current weekly sales of $3,200,000—hardly had the bargaining power to force the new suppliers to use Bohack drivers. And, obvious-

---

1. Prior to the filing of the Chapter XI petition, Bohack's merchandise volume from its stores was approximately $300,000,000 a year. By November 1975, the volume had dropped to $165,000,000 per year (Tr. Nov. 17, 1975, at 38).

ly, a company that had lost ten million dollars up to the date of the Chapter XI petition (Tr. Nov. 17, 1975, at 75–76) could not undertake a re-organization while paying a million dollars annually to truck drivers for whom there is no work. Thus, the point is not, as the union argues, that the transportation costs to Bohack under the new agreements are the same as under the Local 807 contract, but that circumstances left Bohack with a costly and entirely superfluous labor agreement. *See Matter of Cheney Bros.*, 12 F.Supp. 605, 609 (D.Conn. 1935). This is not a case of rejection of a labor contract to improve the debtor's financial position. It is, rather, the hard but clear choice between termination of a collective bargaining agreement involving a hundred and twenty workers or the collapse of a company that employs more than 2,000 men and women.

Moreover, Binder's testimony establishes that the company was in no way motivated by a desire to rid itself of the Local 807 contract. At every stage of the warehouse closing, Bohack attempted to negotiate agreements with its new wholesalers that would provide work for the union. In one instance, the contract with Bozzuto, a grocery supplier, for a time allowed the union to deliver the groceries from Bohack Square to the retail stores after the foodstuffs were trucked in by Bozzuto. Finally, transportation costs under the new agreements do not provide Bohack with a discernible advantage over the collective bargaining contract (Tr. May 19, 1975, at 33).

The union also claims that, aside from the issue of burdensomeness, Bohack either expressly assumed or adopted the terms of the collective bargaining agreement. It points out that between the filing of the Chapter XI petition and the rejection of the contract, Bohack employed Local 807 drivers, paid the agreed wage rates, recognized seniority, contributed to the union's health and pension plans, and engaged in grievance proceedings. In the union's view, "the debtor has so conformed to the contract as to make it binding". *Truck Drivers Local*

*807, supra* at 321, *citing In re Public Ledger, Inc.*, 161 F.2d 762, 767 (3d Cir. 1947).

In *In re Public Ledger, Inc., supra,* a Chapter X re-organization that involved the implied assumption of a labor contract by the trustee in bankruptcy, the circuit court cited several circumstances giving rise to the adoption of a contract:

[T]he term adoption is usually applied . . . to a situation in which a receiver either (a) indicates an intention fully to perform the obligations of the insolvent, (b) indicates an intention to insist on full counterperformance, or (c) acts in such a way with reference to a contract . . . that fairness to the solvent party requires that the consequences of adoption be attributed to his action . . . . .

*Id.* at 767, *quoting* Clark, Foley and Shaw, *Adoption and Rejection of Contracts and Leases by Receivers,* 46 Harv.L.Rev. 1111, 1123 (1933). In *REA Express, Inc., supra,* Judge Mansfield framed the issue as whether the debtor-in-possession misled the employees into believing "that they will have continuity of employment on pre-existing terms." *Id.* at 171. These standards imply affirmative conduct that is inconsistent with a later move to reject entirely the contract. In most circumstances, merely continuing to adhere to the labor agreement for a period following the filing of a bankruptcy petition should not constitute assumption of the contract. The stricter rule, advocated by the union, would result in rejection of labor contracts at the time the bankruptcy petition is filed even though the need for rejection is not yet apparent. Moreover, a reasonable amount of time is necessary to evaluate the financial condition of the bankrupt and then to formulate a plan for re-organization. *See In re American National Trust,* 426 F.2d 1059, 1064 (7th Cir. 1970); 8 *Collier on Bankruptcy* ¶ 3.15[6], at 204 (14 ed. 1976).

Here, the conduct of the debtor following the Chapter XI petition was quite inconsistent with an assumption of the labor agreement. In the first place, the financial deterioration of the company, con-

comitant with the Chapter XI proceeding, put the union on notice that changes would be necessary to avert collapse of the supermarket chain. *See REA Express, Inc., supra* at 171. Within four and one-half months of the Chapter XI petition, Bohack had laid off half of its drivers. Indeed, the union sought arbitration, claiming that Bohack had breached the collective bargaining agreement. Despite the Grievance Committee's finding in favor of the union, Bohack continued to close down warehouses and lay off drivers. The same day that the company moved to reject the labor agreement, the remaining Bohack drivers were terminated. These actions are hardly those of a company that intends to complete fully a labor agreement and nor could there have been any misunderstanding of the debtor's fidelity to the terms of the agreement. Survival, not contract, had the highest priority.

*ARBITRATION*

Both parties raise objections to the bankruptcy judge's orders directing arbitration. The debtor contends that rejection of the contract mooted the need for arbitration and that Local 807 waived its right to arbitrate by submitting a claim for damages to the bankruptcy court as an administrative claim. The union argues that the bankruptcy judge erred in ordering arbitration pursuant to the grievance procedure of § 26(b) of the Bankruptcy Act, 11 U.S.C. § 49(b), since the collective bargaining agreement contains a grievance mechanism. It also contends that any grievance award is not subject to review by the bankruptcy judge as to "the amount and validity of that award."

It is important to recognize at the outset that two distinct, although not necessarily incompatible, policy considerations exist in this case. One involves the broad equitable powers and discretion vested in the bankruptcy court, giving it the ability to protect and administer the estate for the benefit of both creditors and insolvent. 11 U.S.C. § 11. *See In re Westec Corporation,* 449 F.2d 243, 244 (5th Cir. 1971); 1 *Collier on*

*Bankruptcy* ¶ 2.60 *et seq.* (14th ed. 1976). Among the powers exercised by a bankruptcy court within its equity jurisdiction are the allowance and disallowance of claims. 11 U.S.C. § 11(a)(2). The Supreme Court has held that

> a bankruptcy court has full power to inquire into the validity of any claim asserted against the estate and to disallow it if it is ascertained to be without lawful existence. *Lesser v. Gray,* 236 U.S. 70, 35 S.Ct. 227, 59 L.Ed. 471. And the mere fact that a claim has been reduced to judgment does not prevent such an inquiry. As the merger of a claim into a judgment does not change its nature so far as provability is concerned, *Boynton v. Ball,* 121 U.S. 457, 7 S.Ct. 981, 30 L.Ed. 985, so the court may look behind the judgment to determine the essential nature of the liability for purposes of proof and allowance. *Wetmore v. Markoe,* 196 U.S. 68, 25 S.Ct. 172, 49 L.Ed. 390, 2 Ann.Cas. 265.

*Pepper v. Litton,* 308 U.S. 295, 305–06, 60 S.Ct. 238, 244–45, 84 L.Ed. 281 (1939).

The other consideration present in this case is the federal labor policy favoring arbitration "as the means of resolving disputes over the meaning and effect of collective-bargaining agreements." *Nolde Brothers, Inc. v. Local 358, Bakery & Confectionery Workers,* —— U.S. ——, —— 97 S.Ct. 1067, 1073, 51 L.Ed.2d 300 (1977). The grievance machinery of a collective bargaining agreement, a part of the ongoing collective bargaining process, "is at the very heart of the system of industrial self-government." *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 581, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). Moreover, courts generally defer to the arbitrator's interpretation of an agreement.

> The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. . . . The

ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed.

*Id.* at 582–83, 80 S.Ct. at 1352–53. Plenary review by courts of the merits of an arbitrator's decision would render meaningless a contractual provision that the arbitrator's decision is final:

> [T]he question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

*United Steelworkers of America v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960).

■ The emphasis placed on arbitration as a means of preserving labor peace, and the unique role of the bankruptcy court in protecting both creditors and insolvent, are principles that may be consistently animated in this case. To begin with, rejection of a collective bargaining agreement by a bankruptcy court does not obviate the need for arbitration. The Second Circuit was quite specific on this point in its *Bohack* opinion, stating in a footnote that rejection of the labor agreement "does not . . . absolve the parties . . . from a contractual duty to arbitrate their disputes." 541 F.2d at 321 n. 15. *See Nolde Brothers,*

*Inc. v. Local 358, Bakery & Confectionery Workers, supra.* Even in the context of a bankruptcy proceeding, the unique role and special expertise of the arbitrator may be of invaluable assistance to the bankruptcy judge and may serve to avoid unnecessary conflict between labor union and debtor. *See L. O. Koven & Brother, Inc. v. Local 5767, United Steel,* 381 F.2d 196 (3d Cir. 1967).[2]

■ This is not to say, however, that in ordering arbitration a bankruptcy judge can relinquish to the arbitrator decisions that touch on special bankruptcy interests. For example, it has been held an abuse of discretion for a bankruptcy court to allow an arbitrator to decide the question of the preference of the union's claims with respect to other creditors of the bankrupt. *Johnson v. England,* 356 F.2d 44, 52 (9th Cir.), *cert. denied,* 384 U.S. 961, 86 S.Ct. 1587, 16 L.Ed.2d 673 (1966). *See also In re Muskegon Motor Specialities Co.,* 313 F.2d 841 (6th Cir.), *cert. denied,* 375 U.S. 832, 84 S.Ct. 51, 11 L.Ed.2d 63 (1963). Thus, in deciding whether a grievance or claim arising under a rejected collective bargaining agreement is appropriate for arbitration, the touchstone is whether arbitration will preserve labor peace, bring to bear the expertise of the arbitrator on issues such as working conditions or shop practices, and, at the same time, avoid usurpation of the bankruptcy court's critical role in the re-organization proceeding. With these principles in mind, we turn to an examination of the bankruptcy court's orders directing arbitration.[3]

---

**2.** The debtor's heavy reliance on *Allegaert v. Perot,* 548 F.2d 432 (2d Cir. 1977), in arguing against arbitration, is misplaced. At issue there was the arbitrability, not of labor disputes, but of claims arising under the securities laws, which implicated the federal policy favoring determination of stock fraud questions in the federal courts. *Id.* at 437.

**3.** The debtor contends that, "by filing its claim in the Bankruptcy Court as an administrative claim, 807 has waived its right to seek the same remedy in any other forum." For a number of reasons, we find this argument lacks merit. In the first place, in the context of a bankruptcy proceeding, waiver should not be a controlling

consideration in ordering arbitration. Rather, the bankruptcy court must decide on the desirability of arbitration, taking into account the intent of one or both parties to avoid arbitration. The powers of a bankruptcy court to order arbitration are sufficiently broad to overcome a waiver by one of the parties. Second, courts have held that filing an unfair labor practice charge with the National Labor Relations Board does not waive the right to arbitration of a grievance involving the same facts. *E. g., Amalgamated Local 55 v. Metal & Alloy Div.,* 396 F.Supp. 667, 670 (W.D.N.Y.1975); *Glass Bottle Blowers Ass'n v. Arkansas Glass Container Corp.,* 183 F.Supp. 829, 830–31 (E.D. Ark.1960), *aff'd,* 286 F.2d 431 (6th Cir.), *cert.*

### 1. *The Order of October 21*

■ The bankruptcy judge's arbitration order does not satisfy entirely the above criteria. The first three issues referred to the arbitrator, which involve the amount of damages suffered by the employees as a result of the rejection, are appropriate for arbitration. The labor agreement specifies that "[a]ll factual grievances or questions of interpretation" arising under the contract must be the subject of a grievance proceeding. (National Master Freight Agreement, article 8). A broad arbitration clause such as this encompasses every grievance unless the dispute is specifically excluded. *International Union of Elec., Radio & Mach. Workers v. General Electric Co.*, 332 F.2d 485, 488 (2d Cir.), *cert. denied*, 379 U.S. 928, 85 S.Ct. 324, 13 L.Ed.2d 341 (1964); *Publishers' Ass'n of New York City v. New York Mailers' Local Six*, 317 F.2d 624, 625 (2d Cir. 1963), *vacated on other grds.*, 376 U.S. 775, 84 S.Ct. 1132, 12 L.Ed.2d 82 (1964). Moreover, aside from the presumption of arbitrability, the discharge and other claims of the employees are matters involving interpretation of the contract. *See General Teamsters, Chauffeurs & Helpers v. Blue Cab Co.*, 353 F.2d 687, 690 (7th Cir. 1965). The fact that working conditions or shop practices are not directly at issue does not mean the special expertise of the arbitrator is of no value. For example, valuing seniority rights under the unfulfilled portion of the collective bargaining agreement, as well as ascertaining the mitigating value of the new seniority rights of terminated employees who subsequently obtained employment, does not appear to be simply a matter of dollars and cents, rather, it involves knowledge of the likelihood of attrition and advancement of employees within the industry and an interpretation of contract provisions respecting seniority rights. *See Nolde Brothers, Inc., supra* (severance pay); *Straus-Duparquet, Inc. v. Local 3, Int. Bro. of Elec. Wkrs.*, 386 F.2d 649, 650 (2d Cir. 1967) (vacation claims); *International Longshoremen's Ass'n v. New York Shipping Ass'n*, 403 F.2d 807 (2d Cir. 1968) (medical services). Finally, labor peace is a legitimate consideration. The debtor is still in business and, as the Second Circuit made clear, the union has the right to picket the supermarket chain, which could have disastrous consequences for the re-organizing company. *Compare In re Muskegon Motor Specialties Co., supra* at 843.

■ The bankruptcy judge, however, erred in directing the arbitrator to decide whether the rejected agreement should be enforced by re-instatement of each employee. True, in a non-bankruptcy context, this issue would be appropriate for arbitration. But in the context of a Chapter XI arrangement, an arbitrator's decision on this point will affect interests consigned to the bankruptcy court, specifically, whether employment of the Local 807 drivers is "onerous and burdensome" to the debtor-in-possession. Indeed, in allowing rejection of the contract, the bankruptcy judge found that Bohack could not attain financial viability and at the same time employ Local 807 drivers. If the arbitrator is now allowed to re-instate terminated employees, the rejection of the contract becomes meaningless.[4]

■ In addition, we disagree with the order of October 21, 1976, with respect to the provision that all issues determined by the arbitrators are subject to review by the bankruptcy court "as to the status, amount

---

denied, 366 U.S. 930, 81 S.Ct. 1651, 6 L.Ed.2d 389 (1961). Here, as in those cases, the union was attempting to explore all possible means of redress and did not act in a manner inconsistent with arbitration. *See Luckenbach Overseas Corp. v. Curran*, 398 F.2d 403, 405 n. 3 (2d Cir. 1968); *Chatham Shipping Co. v. Fertex S. S. Corp.*, 352 F.2d 291, 293 (2d Cir. 1965). Finally, the debtor has failed to make any showing of prejudice resulting from the filing of the administrative claim. *See ITT World*

*Communications, Inc. v. Communications Workers of America*, 422 F.2d 77, 82–83 (2d Cir. 1970).

4. In addition, an award of the arbitrator directing re-instatement necessarily is an equitable remedy. The Bankruptcy Act, however, "in its present form deals only with claims which can be converted to money." Countryman, *Executory Contracts in Bankruptcy: Part II*, 58 Minn. L.Rev. 479, 565–66 (1974).

and the validity of such arbitrator's award." The Second Circuit specifically limited the bankruptcy judge's authority over an arbitration award to determining "the priority and status" of the award as a matter of bankruptcy law. *Truck Drivers Local 807 v. Bohack Corp., supra* at 321 n.15. No mention was made of discretion to change the amount awarded or inquire into the validity of such an award. As pointed out earlier, questions of interpretation of the contract are for the arbitrator, not the courts. Indeed, by ordering arbitration, the bankruptcy judge implicitly acknowledged that the arbitrator possesses special expertise and competence in resolving labor grievances. There is no point to arbitration proceedings if a bankruptcy judge, lacking experience in the collective bargaining process, undertakes a plenary review of the arbitrator's decisions concerning areas where the arbitrator's knowledge and experience are far superior. Once an award is made, however, its status and priority are questions for the special expertise of the bankruptcy court, which may then relegate the claims of the union to a proper place in the framework of the re-organization.

Finally, the union contends that the contract controls the question of the grievance procedure, not § 26 of the Bankruptcy Act. We agree. The agreement to arbitrate survives the filing of the bankruptcy petition, *Tobin v. Plein*, 301 F.2d 378 (2d Cir. 1962), the expiration of the collective bargaining contract, *Nolde Brothers, Inc., supra*, and the rejection of the labor agreement, *Truck Drivers Local 807, supra*. If the contractual duty to arbitrate survives rejection, there is no reason why the griev-ance procedures established by the parties should not also survive. Moreover, in *Tobin v. Plein, supra*, the Second Circuit rejected the argument that arbitration proceedings ordered by a bankruptcy court must be governed by § 26 of the Bankruptcy Act:

> [T]his section is clearly drawn to provide arbitration machinery where no contractual arrangements exist. It does not supersede explicit contractual provisions.

301 F.2d at 381, *citing Schilling v. Canadian Foreign S.S. Co.*, 190 F.Supp. 462 (S.D.N.Y. 1961).[5] Here, the collective bargaining agreement contains detailed procedures for the arbitration of grievances arising under the agreement. These provisions govern the arbitration directed by the bankruptcy court.[6]

### 2. The Order of October 15

A confusing situation exists because of the October 15 order signed by Judge Parente. In that order, Local 807 was directed to submit its grievances with the debtor "to arbitration, in accordance with the procedure set forth in § 26 of the Bankruptcy Act, to determine if [the debtor-in-possession] breached said collective bargaining agreement and to render a finding on damages, if necessary." The subsequent order of October 21 only directed arbitration on specific issues, and did not mention arbitration of the issue of whether the collective bargaining agreement was breached. Since both orders are appealed, we will assume that the second order did not vacate the first one.

The question is whether, in view of the rejection of the collective bargaining agreement, it is necessary to determine

5. Rule 919 of the new Bankruptcy Rules provides in pertinent part:
   (b) Arbitration. On stipulation of the parties to any controversy affecting the estate the court may authorize the matter to be submitted to final and binding arbitration. This rule also appears to be directed at disputes where contractual provisions do not exist.

6. The question still remains as to the proper grievance jurisdiction under the collective bargaining agreement. In our memorandum of decision and order, dated November 19, 1975, we concluded that the grievance, as originally presented to the Joint Local Committee, "was a matter outside its jurisdiction and the proceedings upon which it was based, a nullity." 74 B 933, at 11 n.10 (Nov. 19, 1975). The union, in response to the Second Circuit's suggestion that "the parties could conceivably agree upon the proper grievance jurisdiction," 541 F.2d at 319 n.10, has withdrawn its allegation of a violation of article 32 of the Agreement. In its view, this means that "the Committee is the [proper] grievance tribunal." If the debtor disagrees, the bankruptcy court will have to determine the appropriate committee for arbitration.

whether the agreement was breached by the employer in the months following the filing of the bankruptcy petition and prior to rejection. Had the contract been assumed or affirmed,

> a claim for wages or other contractual benefits for the period of the contract, after employment ceased would arise only if the arbitrator or the court also finds that the contract was breached by the employer's actions after the petition was filed.

*Truck Drivers Local 807, supra* at 321 n.16. Rejection of the contract, however, operates as a unilateral breach of the contract at the time of filing the Chapter XI petition. 11 U.S.C. § 103(c). *See Truck Drivers Local 807, supra* at 321; 8 *Collier on Bankruptcy* ¶ 3.15[7], at 206 (14 ed. 1976). Thus, as of July 30, 1974, the date of the Chapter XI petition, the collective bargaining agreement was terminated by Bohack. Whether Bohack was within its rights under the contract in eliminating jobs is a moot question. The only issue that remains is whether the employees suffered damages as a result of the rejection and, if so, how much. *See* 8 *Collier on Bankruptcy* ¶ 3.15[10], at 208 (14 ed. 1976). Any finding of damages would, of course, be diminished by salaries paid to union members after filing of the petition, as well as by any wages and rights obtained from employment after termination and during the remainder of the period covered by the collective bargaining agreement.

This analysis rests, in part, on the pre-Chandler Act doctrine, judicial in origin, that the filing of a bankruptcy petition is an anticipatory breach of the bankrupt's executory contracts. *City Bank Farmers Trust Co. v. Irving Trust Co.,* 299 U.S. 433, 440, 57 S.Ct. 292, 295, 81 L.Ed. 324 (1937); *S & W Holding Co. v. Kuriansky,* 317 F.2d 666, 668 (2d Cir. 1963). The nonbankrupt party had the option to treat the contract as breached and seek damages. The enactment of the Chandler Act in 1938, however, gave the trustee or receiver the option to assume or reject executory contracts of the bankrupt, 11 U.S.C. § 713(1), and no mention was made of the anticipatory breach

doctrine. *See* Countryman, *Executory Contracts in Bankruptcy: Part II,* 58 Minn.L. Rev. 479, 520 (1974). A pre-Chandler Act decision of the Second Circuit presaged the effect on the anticipatory breach doctrine of this congressionally authorized option:

> A trustee in bankruptcy is entitled to a reasonable opportunity to determine whether to adopt or reject an executory contract. If he adopts it and performs the bankrupt's duties thereunder, he can insist upon performance by the other party. While the trustee still has the matter of adoption under advisement, it may be assumed that he could restrain the other party from disposing of the subject-matter of the contract or otherwise acting in a manner to impair the trustee's option to adopt the contract.

*Matter of United Cigar Stores Co. of America,* 89 F.2d 3, 6 (2d Cir. 1937) (Swan, J.). *Accord, Matter of Gulfco Investment Corp.,* 520 F.2d 741, 743 (10th Cir. 1975).

The concept of bankruptcy-as-anticipatory breach nonetheless underpins the apparent fiction that rejection of the executory contract is a breach of the contract as of the date of filing of the petition. If the contract is rejected,

> the bankrupt's anticipatory breach is never cured and the conduct of the other party in dealing with the subject-matter of the contract in the meantime has only resulted in mitigating the damages caused by rejection.

*In Matter of Cigar Stores, supra* at 6. Thus, in the present case, the filing of the Chapter XI petition was an anticipatory breach of the collective bargaining agreement, although the union could not assert the breach against the debtor-in-possession. 6 *Collier on Bankruptcy,* ¶ 3.23, at 576–78 (14 ed. 1972). Once the contract is rejected, the anticipatory breach could never be "cured," and the question of violations of the labor contract following the filing of the petition became academic. The only issue left by the rejection is damages, as mitigated by the conduct of the parties following the Chapter XI petition.

In sum, the order of the bankruptcy court allowing rejection is affirmed.[7] The October 21 arbitration order is affirmed insofar as it directs arbitration on the three issues involving damages resulting from the rejection. Otherwise, the order of October 21 is reversed, with directions to proceed in accordance with this opinion as to procedures for arbitration and review of any arbitration award. The order of October 15 is reversed and vacated.

---

7. Although the partie. filed a notice of appeal from the orders of October 15 and 21, those orders did not directly involve the rejection of the contract. The May 28 order allowing rejection was immediately appealed to this court, and remained pending until this proceeding. Accordingly, this memorandum affirms the May 28 order.